[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 24, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13791

_____

D. C. Docket No. 05-61240-CV-JIC

ANNETTE SHEELY,

Plaintiff-Appellant,

versus

MRI RADIOLOGY NETWORK, P.A.,
d.b.a. University MRI-JFK,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 24, 2007)**

Before ANDERSON, COX and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

At issue today are whether the plaintiff's claims for injunctive and

declaratory relief under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12181-12189, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, became moot after the defendant voluntarily ceased the alleged misconduct, and whether non-economic compensatory damages are available under the Rehabilitation Act. After thorough review, we conclude that the plaintiff's claims are not moot because the defendant has not met its heavy burden of showing under controlling law that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (internal quotation marks omitted). We also hold that non-economic damages are indeed available under the Rehabilitation Act. Accordingly, we reverse and remand for further proceedings consistent with this opinion. Finally, we affirm the district court's determination that the plaintiff failed to state a claim under the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq.

## I. Background

The essential facts, which we cull from this summary judgment record and take in the light most favorable to the plaintiff, see Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999), are these; unless otherwise noted, they are undisputed. Plaintiff Annette Sheely ("Sheely") has been legally blind since 1999,

and is aided by the use of an eighty-pound Labrador retriever guide dog.  On June 7, 2005, Sheely accompanied her minor son to one of five diagnostic imaging facilities owned and operated by the defendant MRI Radiology Network, P.A. ("MRN"), where her son had an appointment to receive magnetic resonance imaging (an "MRI").  When Sheely checked her son in, the receptionist, Felicia Anderson ("Anderson"), asked whether Sheely's dog was a service animal.[1]  Sheely replied that he was, and nothing more was said at that time.  Sheely and her son waited in the main waiting room for his appointment.

Beyond the main waiting room is a hallway, at the end of which is a "holding area" with three or four chairs and a table with magazines on it where patients wait once again to be called in for their actual examination.  The holding area also contains lockers where patients place certain belongings, including any metal items like jewelry or watches, prior to entering the MRI suite.  Off of this hallway lie four examination rooms -- two MRI "suites," one x-ray room, and one ultrasound room.  The typical MRI suite is divided into two rooms by glass. Metal-sensitive MRI equipment and the patient are located in one room, while the

---

[1] According to the implementing regulations of Title III of the Americans with Disabilities Act, "[s]ervice animal means any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items."  28 C.F.R. § 36.104.

3

technician performs the examination remotely from the other side of the glass in the adjoining room.

When Sheely's son was called, he asked his mother to accompany him. According to the deposition testimony of Lana Amiel, MRN's Director of Front Office Management ("Amiel"), parents who wished to do so were permitted to accompany their minor children beyond the main waiting room to the "holding area" at the end of the hallway. Nevertheless, when Sheely stood to accompany her son, the receptionist, Anderson,[2] told her that she would have to remain in the main waiting room, since it was MRN's policy that animals were not permitted beyond that point. When Sheely asked if her dog would be permitted beyond the main waiting room if she were the patient, Anderson said that the dog would still not be permitted beyond the main waiting room, and that Sheely would only be treated if she brought someone else to watch the dog in that area.

When Sheely asked why her service dog was not permitted beyond the main waiting room, Anderson gave various reasons. According to Sheely, Anderson said, among other things, that the policy existed for the dog's safety, for Sheely's own comfort, and that it reflected the concern that the metal in the dog's harness might harm the MRI equipment. According to the police report filed following the

---

[2] Anderson is apparently no longer with MRN and could not be located for deposition.

incident,[3] Anderson similarly told the investigating officer that the dog was not permitted in the MRI exam room because of the metal in the dog's harness and for the dog's own safety, and that although Sheely would have been permitted in the hallway waiting area, the dog was not permitted there because, in the officer's words, "having the animal in this area could have been a problem due to it being a traveled hallway." Anderson also told the officer that she believed that MRN was a private facility, not a public accommodation subject to the Americans with Disabilities Act, and that Sheely's son was competent and did not need a parent to accompany him. In an email sent to Amiel on the morning of June 9, Anderson added that "[t]his was a very big dog and there would not be room for him to even lie on the floor in the back hall waiting area for MRI patients." MRN admitted in its answer that it told Sheely her dog was not allowed past the waiting room "for several reasons, including but not limited to, the issue of space, safety, compliance with the applicable procedures for entry into the MRI room and the preclusion of

_____

[3] The next day, Sheely filed a complaint with the police about the incident, alleging that MRN was in violation of Florida Statute § 413.08(3), which provides that "[a]n individual with a disability has the right to be accompanied by a service animal in all areas of a public accommodation that the public or customers are normally permitted to occupy." Although the police report concludes that "there did seem to be a technical violation of Florida Statute," the report also indicates that police declined to pursue charges with the Florida State Attorney's Office.

metal objects in a magnetic area."[4]

Sheely's son eventually proceeded alone beyond the main waiting room for his appointment.  Meanwhile, Sheely called MRN Director of Scheduling Jim Stannard ("Stannard"), with whom she had had prior contact concerning MRN's accommodation of her disability, about the situation.[5]  According to Sheely, Stannard told her that a parent was entitled to accompany her minor child beyond the main waiting room, and that she was entitled to do the same with her dog, like any other parent.[6]  Sheely says that Stannard then called Anderson, and that when Anderson hung up with Stannard she said, "Well, we have to let her back."

However, when she was still not admitted, Sheely again called Stannard.

---

[4] Amiel later testified that animals are not allowed in the holding area, in part, "because there are patients back there that are having certain types of studies that could have open IVs and there could be airborne pathogens that could compromise the safety of the patients."  She said, however, that this was "common knowledge" and her own personal belief, and that she had not discussed this particular concern with anyone else at MRN.

[5] When Sheely had called MRN to make the appointment for her son (a few days before the appointment itself), the MRN staff member who answered requested that Sheely have a sighted person call and make the appointment instead, so that Sheely's son's prescription could be read to the MRN staff over the phone. Sheely complained to Stannard, who permitted her to fax the prescription to MRN.

[6] In his deposition testimony, Stannard did not provide a full account of his phone conversation with Sheely or of any other relevant conversations he may have had with MRN employees that day.  He simply testified that he had told Sheely that there could be many reasons why she was not being allowed to accompany her son with her dog, and that since he was remote he would have to make some calls to the MRN employees on location who were involved with the situation and get back to her.  Although he apparently did not share this information with Sheely at the time, Stannard testified that he had in mind several reasons, including "hygiene" and the danger of any metal in the dog's harness to the MRI equipment.

6

Sheely says that Stannard explained that he was currently on the phone with Amiel, who had explained that she was denying Sheely's dog access based on MRN owner Fred Steinberg's policy that animals are not permitted beyond the waiting room, without exception for service animals. According to Amiel's testimony, at the time of the incident, MRN did not have a written policy covering either how patients with disabilities would be accommodated generally, or how MRN would approach service animals in particular. Instead, MRN had an unwritten "policy" that service animals were permitted only in the main waiting room area, and that she had spoken to Steinberg "several times over the years" regarding that policy. In the end, Sheely was not permitted to take her dog beyond the main waiting room.

The incident with Sheely was apparently not the first time that a patient had disputed MRN's unwritten service animal policy. Within one or two days of the incident involving Sheely, Anderson emailed Amiel requesting that MRN develop a "written policy regarding 'pets' in our facility," complaining that the incident with Sheely was "the third time within a year's time that this issue has surfaced once again." (emphasis in original). Amiel likewise testified that animals had been brought into MRN facilities "several times," though she suggested that at least some of these incidents involved pets rather than service animals.

The record also contains information regarding a May 19, 2004, incident in which a patient, Mary Rose Mullane ("Mullane"), appeared for her appointment with her husband and her poodle, whom she alleged was her service animal. Anderson and Amiel told Mullane that her dog was not allowed anywhere in the facility, and that her husband would have to wait with the dog outside. When Mullane refused, stating that she believed that MRN's policy violated the ADA, MRN asked her to leave, and eventually called the police to have the Mullanes escorted off the premises. Anderson told the investigating officer that both Amiel and Steinberg were notified of the incident as it unfolded and had responded that Mullane was welcome so long as her dog left the building. The officer concluded that no violation had occurred because MRN was a private business, not a "public" place. After the incident, Amiel placed a note in Mrs. Mullane's file indicating that she was told "[a]s per Dr. Steinberg no animals within the facility," that "[s]ervice was denied," and future appointments were not to be scheduled for her.[7]

_____

[7] MRN apparently refused to allow Mullane's dog into the facility at all -- that is, not even in the waiting area -- because it did not believe Mullane's claim that the dog was a service animal. In her deposition testimony in this case, Amiel explained that she contacted Steinberg during the Mullane incident, and when she told him that the dog did not "appear [to her] to be" a service animal, he said, in her words, that "common general household pets are not allowed in the facility at all." In her testimony, however, Amiel was unable to provide any basis for determining whether an animal is a service animal or not. According to the police report, Anderson told the officer that she did not ask Sheely to remove her dog from the premises entirely because she recognized the dog as a service animal. In the note she placed in Sheely's son's medical file, Anderson noted that Sheely's dog "had papers attached to his side collar that appeared to be accurate." Anderson's email to Amiel following the incident with Sheely,

On July 27, 2005, about a month and a half after the incident, Sheely sued MRN in the United States District Court for the Southern District of Florida. Count one of her complaint sought declaratory and injunctive relief, as well as costs and attorney's fees, under Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("ADA"). Count two sought the same relief, plus non-economic compensatory damages, under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("RA"). Finally, count three sought the same relief, plus punitive damages and interest, under the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq. ("FCRA"), and Florida's service animal statute, Fla. Stat. § 413.08.

On April 20, 2006, almost nine months into the lawsuit and after eight months of discovery and nearly five months of mediation that ended in stalemate, MRN moved for summary judgment, announcing that, two days earlier, it had implemented a new, written Service Animal Policy that rendered all of Sheely's claims moot. According to the new policy, it is MRN's

> policy to follow all applicable laws with respect to allowing access to 'service animals' accompanying persons with disabilities. . . . The law requires that all service animals that are trained to assist their owner who has a disability be permitted access to areas where the user is normally allowed to go unless its [sic] can be shown either (1) that a service animal's presence will result in a fundamental alteration of the goods, services, facilities, privileges, advantages, or accommodations offered, or (2) the facility's safe operations would be jeopardized.

however, requested that MRN develop a "written policy regarding 'pets' in our facility."

The policy instructs employees to first determine whether an animal brought into the facility is a service animal or a pet, and if the latter, not to allow the animal access to the facility. Next, if the animal is determined to be a service animal, the employee must determine whether the service animal "will present either (a) a direct threat to health or safety, or (b) a significant threat of disruption to the services provided by the Company." If an employee determines that either threat exists, then the service animal will be denied access to the facility and will be temporarily secured elsewhere. If neither threat is determined to exist, then the animal is permitted to go "where its user is going in the facility," including "all waiting areas, restrooms, hallways, changing areas and ultra sound rooms."[8]

Rick Steinberg, MRN's Vice President of Finance and Business Administration, emailed the policy to employees, who were required to print and sign a form indicating that they had received the policy and understood that it contains "very important information." In an affidavit accompanying MRN's motion for summary judgment, Steinberg explained that

---

[8] Service animals are permitted in x-ray and CAT scan rooms once the user has been informed of the dangers to the animal of radiation exposure, and so long as the animal does not significantly disrupt the services. Service animals are also permitted in MRI "chamber" rooms once it is determined that the animal does not have any metal on or inside its body, provided there is "no risk of significant disruption caused by the service animal to the MRI." If the service animal does not accompany its user into an examination room, MRN prefers that the user arrange for a friend or family member to watch the animal in any of MRN's waiting areas; if no such friend or family member is available, then MRN will provide "a suitable temporary location where the user can safely secure the service animal."

10

[t]he purpose of the written policy was to inform employees of [MRN's] commitment to follow the law with respect to service animal access, to help employees identify service animals, to inform employees of [MRN's] rules related to service animal access and to go above and beyond the requirements of the ADA and Florida law so as to avoid future disputes such as the one at issue [in the instant case].

According to the affidavit, after the policy was implemented on April 18, a patient with a service animal entered MRN's Boca Raton facility on April 19 and was permitted access in accordance with the policy.

However, MRN also moved for summary judgment on several alternative grounds, including that MRN was never liable for any violation of the ADA or RA. Specifically, MRN argued that under both the ADA and the RA, it was under no obligation to accommodate Sheely until she explicitly requested the accommodation of being permitted to accompany her son as far as the door to the MRI room. Moreover, MRN claimed that it was not liable under the RA because it did not deny Sheely, who was not the patient, any benefit. Finally, MRN argued that Sheely failed to state a claim under Florida law.

Sheely cross-moved for summary judgment on all counts. The district court, considering both motions together, granted summary judgment in favor of MRN on all counts. The court held that Sheely's claims for declaratory and injunctive relief under the ADA and the RA were moot, given MRN's voluntary cessation of the allegedly wrongful conduct. As for the only remaining relief Sheely requested

11

under the RA, the district court determined that emotional damages are not available under that statute. Finally, the district court concluded that Sheely failed to state a claim under the Florida Civil Rights Act.

This appeal followed.

## II. Mootness

Whether a case is moot is a question of law that we review de novo. Troiano v. Supervisor of Elections in Palm Beach County, 382 F.3d 1276, 1282 (11th Cir. 2004).

Although the district court characterized its rejection of Sheely's claims for declaratory and injunctive relief as a grant of summary judgment for MRN pursuant to Fed. R. Civ. P. 56, it is clear from the district court's opinion that the basis for its ruling was the lack of subject matter jurisdiction because of mootness. We have repeatedly said that when a district court disposes of a case on justiciability (mootness) grounds we will treat the district court's determination as if it was ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), even if the district court mistakenly has labeled its ruling a grant of summary judgment. Thus, for example, recently in Troiano we held that a district court's finding of mootness, although embodied in an order granting summary judgment under Rule 56, must be treated "as if it were a ruling on a Rule

12

12(b)(1) motion." 382 F.3d at 1278 n.2. And in United States v. Blue Cross &

Blue Shield of Ala., Inc., 156 F.3d 1098, 1101 n.7 (11th Cir. 1998), a panel of this

Court likewise ruled that a district court's order granting summary judgment for

lack of federal question subject matter jurisdiction must be treated "as a dismissal

under Rule 12(b)(1)." See also Madison v. United States, 752 F.2d 607, 609 (11th

Cir. 1985) (per curiam) (examining a dismissal under the standards of Rule

12(b)(6) even though the district court denominated its ruling as a grant of

summary judgment); Parker v. McKeithen, 488 F.2d 553, 555 (5th Cir. 1974)

(same); Tuley v. Heyd, 482 F.2d 590, 593-94 (5th Cir. 1973) ("It is a familiar

principle that the label a district court puts on its disposition of a case is not

binding on a court of appeals.").[9] Accordingly, we treat the district court's grant of

final summary judgment here as a dismissal for lack of subject matter jurisdiction

under Rule 12(b)(1).[10]

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[10] We have no doubt that the district court disposed of Sheely's claims for declaratory and injunctive relief on the grounds of mootness. To begin with, MRN moved for summary judgment before the district court on, among others, justiciability grounds claiming both a lack of standing and mootness. More significantly, the district court, although characterizing its ruling as being a grant of summary judgment, entered that judgment on the declaratory and injunctive relief claims because it concluded that the claims were moot. The relevant portion of the district court's opinion is entitled "Standing/Mootness." (R.1-47 at 5.) Moreover, the district court prefaced its final paragraph dealing with mootness precisely this way and cited to Troiano, a mootness case. And if any doubt remained about the basis for its decision, the district court made absolutely clear in its discussion of liability under the ADA that it viewed Sheely's

The district court found Sheely's claims for injunctive and declaratory relief under the ADA and the RA moot because MRN voluntarily ceased the behavior Sheely challenges. We have explained the relationship between mootness and the court's subject matter jurisdiction this way:

> Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of "Cases" and "Controversies." . . . [A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and

---

claims for declaratory and injunctive relief as being moot. After explaining that the parties had disagreed about whether Title III of the ADA required a plaintiff to make an affirmative request for a reasonable accommodation, and whether it was relevant that MRN's receptionist assumed that Sheely wanted access to the MRI scan room itself, the district court expressly said that it need not address these merits issues "[s]ince the Court has previously ruled that the claim under the ADA in Count I is moot . . . ." (R.1-47 at 10) (emphasis added).

       To be sure, the analysis of whether a case is moot overlaps with the analysis of whether a permanent injunction is appropriate on the merits because both are concerned with the likelihood of future unlawful conduct. But the two inquiries are strikingly different. As we discuss at length below, a defendant seeking dismissal on mootness grounds under the doctrine of voluntary cessation bears the extremely heavy burden of showing that it is absolutely clear that he will not revert to his old ways. But whether a permanent injunction is appropriate -- a question that we do not address and upon which we express no opinion -- turns on whether the plaintiff can establish by a preponderance of the evidence that this form of equitable relief is necessary. See United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). We emphasize, however, that, like the district court, we have decided only the mootness question; we offer no opinion on the merits of Sheely's claims for declaratory and injunctive relief. Even though a case is not moot, that does not mean that injunctive relief follows automatically; undoubtedly, injunctive relief requires "something more than the mere possibility which serves to keep the case alive." W. T. Grant, 345 U.S. at 633. Therefore, nothing in this opinion should be read to preclude the district court on remand, and after appropriate review, from deciding that equitable relief is not warranted. See United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203-04 (1968) (concluding that the case was not moot but noting that the district court was not obligated to grant equitable relief on remand: "Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. This is a matter for the trial judge." (citation omitted)).

14

must be dismissed.

Troiano, 382 F.3d at 1281-82 (citation omitted).  However, "[t]he doctrine of voluntary cessation provides an important exception to the general rule that a case is mooted by the end of the offending behavior," id. at 1282 (emphasis added):

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  If it did, the courts would be compelled to leave the defendant free to return to his old ways.  In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (internal quotation marks, citations, and alterations omitted; emphasis added); see also United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953) ("[T]o say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right.  The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.").

The "formidable," "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  Laidlaw, 528 U.S. at 190, 189 (alteration, internal quotation marks, and citation omitted); see also Sec'y of Labor v. Burger King Corp., 955

15

F.2d 681, 684 (11th Cir. 1992) (describing the defendant's burden as "heavy"). A defendant's assertion that it has no intention of reinstating the challenged practice "does not suffice to make a case moot" and is but "one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts." W. T. Grant, 345 U.S. at 633; see also Hall v. Bd. of Sch. Comm'rs of Conecuh County, 656 F.2d 999, 1001 (5th Cir. Unit B Sept. 1981) ("To defeat jurisdiction . . ., defendants must offer more than their mere profession that the conduct has ceased and will not be revived."). Although government actors receive the benefit of a rebuttable presumption that the offending behavior will not recur, private citizens are not entitled to this legal presumption. See Troiano, 382 F.3d at 1283 (courts are "more apt to trust public officials than private defendants to desist from future violations").

While the district court recited, at the broadest level, the relevant legal test for determining mootness in a voluntary cessation case, and although it acknowledged that "courts are more likely to trust public defendants on a voluntary cessation issue than private defendants," it nevertheless concluded that on the "undisputed record," the instant case was moot. In so concluding, the district court did not acknowledge, much less apply to this record, any of the basic factors that both the Supreme Court and this Court have found important in determining

16

mootness where a private defendant has voluntarily ceased the conduct at issue. Specifically, we have found relevant at least the following three factors: (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability. The application of these factors to this undisputed record yields the conclusion that it is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," Laidlaw, 528 U.S. at 189 (internal quotation marks omitted), and therefore that this case is not moot.

First, it comes as no surprise that courts are more likely to find that the challenged behavior is not reasonably likely to recur where it constituted an isolated incident, was unintentional, or was at least engaged in reluctantly. Conversely, we are more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a "continuing practice" or was otherwise deliberate. See, e.g., W. T. Grant, 345 U.S. at 632 n.5 ("When defendants are shown to have settled into a continuing practice or entered into a conspiracy . . ., courts will not assume that it has been abandoned without clear proof." (internal quotation marks omitted)); Troiano, 382 F.3d at 1285-86 (fact that challenged

17

behavior "was a good-faith effort to deal with an administrative dilemma" that was "not likely to be present in the future" supported finding of mootness); Burger King Corp., 955 F.2d at 684 ("five-year history of violations" cut against finding of mootness); Hall, 656 F.2d at 1000 ("longstanding practice" cut against finding of mootness).

MRN says that its treatment of Sheely was "an isolated incident" rather than the result of a "prior entrenched policy." The undisputed testimony of MRN's own employees, however, strongly suggests that Sheely's treatment was the result of a years-long policy created by MRN's owner, communicated through MRN's ranks, and enforced on multiple occasions, sometimes vehemently. Director Amiel offered undisputed testimony that MRN owner Fred Steinberg created what she termed the MRN's animal "policy," and that she had spoken to him "several times over the years" regarding it. Consistent with this testimony, after the May 2004 Mullane incident, Amiel placed a note in Mullane's file stating, "[a]s per Dr. Steinberg no animals within the facility" (emphasis added). Anderson, too, complained that the incident involving Sheely was "the third time within a year's time that this issue has surfaced once again."

Nor does the record reflect that these incidents involved only low-level MRN employees. The Mullane incident -- in which MRN ultimately called the

18

police to enforce its animal policy and determined not to offer Mullane any further services -- involved input by Anderson, a receptionist, Amiel, a director, and Steinberg, the owner of MRN himself.[11] The incident involving Sheely involved at least Anderson, Amiel, Stannard, another director, and an unidentified MRN employee named Carla.[12]

---

[11] MRN argues nevertheless that it had no entrenched policy because neither the Mullane incident nor any other incident prior to the Sheely incident resulted in any formal claim of discrimination against MRN. We disagree. This good luck on the part of MRN does not convert a series of at least three incidences within one year into an isolated event, nor does it negate the record evidence suggesting that MRN had a longstanding animal policy. Similarly, we are reluctant to accept MRN's invitation to discount the Mullane incident merely because MRN continues to doubt that the dog involved in that incident was a service animal. We will never know whether the dog was a service animal or not because Amiel, on owner Fred Steinberg's command, refused Mullane service after determining -- without any record basis, and despite the fact that the ADA prohibits public accommodations from requiring proof that an animal is a service animal -- that the dog, a poodle, did not "appear to be" a service animal. See Susan L. Duncan, APIC State-of-the-Art Report: The Implications of Service Animals in Health Care Settings, 28 Am. J. Infection Control 170, 171 (2000) (Def.'s Concise Statement of Material Facts App. N) ("There is no validated evidence that any particular breed is better in the role -- service dogs can be any size or any breed.").

[12] MRN similarly suggests that the incident with Sheely was just a "misunderstanding." MRN says that it believed Sheely intended to take her service animal, with its metal harness, into the MRI examination room itself, and that it legitimately prevented her from doing so, as it would have done with any person, disabled or not, carrying metal on their person. MRN explains that it believed this to be Sheely's intention because when Sheely stood to accompany her son, she never made it clear that she wished to accompany her son up to, but not into, the actual MRI examination room. In Anderson's words, Sheely merely said that "the dog goes where she goes." Although MRN admits "that MRN advised Sheely that her dog could not accompany her past the [main] waiting area" -- which includes not only the examination room but also the hallway waiting area where non-disabled parents of minor children are permitted to go, and although by all accounts Sheely's dog was denied access beyond the main waiting room for several reasons that go beyond the danger to the MRI equipment in the examination room, it suggests that Anderson's statement to this effect was made only because it believed Sheely's unstated wish was to go as far as the MRI examination room. The district court, considering this issue for purposes of MRN's liability under the ADA and the RA, found that a question of fact exists on this issue, but found no further need to address the question because of its legal

19

Second, we are more likely to find that cessation moots a case when cessation is motivated by a defendant's genuine change of heart rather than his desire to avoid liability.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109 (1998) ("presumption" of future injury when cessation occurs in response to suit); Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 71-72 (1983); W. T. Grant, 345 U.S. at 632 n.5 ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit . . . ."); Nat'l Adver. Co. v. City of Miami, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam) ("[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction."); Troiano, 382 F.3d at 1285 (in moot case, cessation occurred prior to suit); Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1331-32 (11th Cir. 2004) (same); Dow Jones & Co. v. Kaye, 256 F.3d 1251, 1255 n.4 (11th Cir. 2001) (same); Burger King Corp., 955 F.2d at 684 (in non-moot case, cessation came "on the eve of trial"); Nat'l Adver. Co. v. City of Fort Lauderdale, 934 F.2d 283, 286 (11th Cir. 1991) (in non-moot case, cessation came six weeks after suit followed the next day by motion to dismiss); Jager v. Douglas County Sch. Dist., 862 F.2d 824, 833-34 (11th Cir.

---

determination.

20

1989) (in non-moot case, cessation came only "[u]nder the imminent threat of the [plaintiffs'] lawsuit"); Hall, 656 F.2d at 1000 (same); City of Waco v. Envtl. Prot. Agency, 620 F.2d 84, 86-87 & n.10 (5th Cir. 1980) (in non-moot case, cessation came "only six days before oral argument").

Although a defendant's "profession" not to revive the challenged practice, standing alone, "does not suffice to make a case moot," W. T. Grant, 345 U.S. at 633, here, MRN has not made the minimal representation the Supreme Court rejected in W.T. Grant. This is perhaps not surprising, for the record does suggest that MRN was motivated by a desire to avoid liability. Rick Steinberg, MRN's Vice President of Finance and Business Administration, conceded as much in his affidavit, stating that "[t]he purpose of the written policy was to . . . avoid future disputes such as the one at issue [in the instant case]." The timing of MRN's new policy reinforces our conclusion. MRN's change in policy -- and litigation strategy -- came almost nine months into this lawsuit, after eight months of discovery and nearly five months of mediation, and appears to have coincided with a change in counsel. It was immediately after terminating one law firm in favor of another that MRN employed the services of ADAhelp, Inc., to help it draft its new policy. Nor did it take long for it to occur to MRN that this new policy might make the lawsuit against it moot; MRN moved for summary judgment on the grounds of mootness

just two days later.[13]

Third, under controlling law, a defendant's failure to acknowledge wrongdoing similarly suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains.  See W. T. Grant, 345 U.S. at 632 (noting that the "public interest in having the legality of the practices settled[] militates against a mootness conclusion"); Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43 (1944) (controversy remains where defendant "has consistently urged the validity of the [practice] and would presumably be free to resume [it] were not some effective restraint made"); United States v. Trans-Mo. Freight Ass'n, 166 U.S. 290, 308 (1897) ("[M]ere [cessation] is not the most important object of this litigation. The judgment of the court is sought upon the question of the legality of the [challenged practice] . . . . [Defendants] do not admit . . . illegality . . ., nor [promise] not to enter into a similar [practice]. On the contrary, by their answers, the defendants claim that the agreement is . . . perfectly proper . . . ."); see also Coral Springs St. Sys., 371 F.3d at 1332-33 (in moot case, defendant "expressly disavowed any

---

[13] Similarly, the timing of the only occasion on which MRN has apparently applied its new policy -- on April 19, one day after implementing the new policy and, more significantly, one day before MRN planned to move for summary judgment on the grounds of mootness -- limits the extent to which this incident can reasonably be said to constitute powerful evidence of MRN's commitment to forever adhering to its new policy.

22

intention of defending" the ceased conduct); <u>ACLU v. Fla. Bar</u>, 999 F.2d 1486, 1494-95 (11th Cir. 1993) (in non-moot case, defendant was not "bound by its court statements," had "the discretion to change its policy" back, and reasonably might do so where it continued to assert the old policy's validity); <u>Jager</u>, 862 F.2d at 833-34 (in non-moot case, defendants "never promised not to resume the prior practice" and "continue to press on appeal that the voluntarily ceased conduct should be declared constitutional"); <u>Hall</u>, 656 F.2d at 1000 (in non-moot case, defendants "disputed the constitutionality of the practice up to the day of trial, when defense counsel for the first time indicated they had no intention of reviving [it]"); <u>United States v. Bob Lawrence Realty, Inc.</u>, 474 F.2d 115, 127 (5th Cir. 1973) ("[I]n the face of appellant's own inability to recognize his transgressions of the Act, we decline to assume that he will not violate the Act in the future.").

In this case, MRN has consistently urged the validity of its actions toward Sheely, so that a controversy between the parties over the legality of those actions remains. MRN continues to this day to insist that because Sheely was not the patient when the incident occurred she was denied no benefit, and it committed no violation of the Rehabilitation Act.[14] Similarly, Steinberg's affidavit describes the

---

[14] Although the district court did not base its grant of summary judgment on this factor and we therefore need not address it, we observe that under the RA, as amended,

[n]o otherwise qualified individual with a disability . . . shall, solely by reason of

23

new policy as "go[ing] above and beyond the requirements of the ADA and Florida law" (emphasis added).

Our binding precedent says that "voluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." Nat'l Adver. Co. v. City of Miami, 402 F.3d at 1333. We cannot say with any degree of confidence, let alone with

---

her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . . [where] "program or activity" means all of the operations of . . . an entire corporation, partnership, or other private organization . . . any part of which is extended Federal financial assistance.

29 U.S.C. § 794(a)-(b) (emphasis added). Congress specifically amended the RA to include this broad language after the Supreme Court gave "program or activity" an interpretation that Congress deemed to be unduly narrow. See U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605-06 (1986); Grove City Coll. v. Bell, 465 U.S. 555, 570-74 (1984). Given the now-broad application of the Act to "all of the operations of" an "entire" covered entity, we are not persuaded that Sheely's allegations that MRN denied to her what it provides to non-disabled parents of minor patients -- namely, the "benefit" of accompanying their children to the hallway waiting area -- are not cognizable under the Act. Indeed, several courts have held that disabled third parties accompanying the primary recipient of a covered entity's services count as "otherwise qualified individuals" under the Act. See, e.g., Rothschild v. Grottenthaler, 907 F.2d 286, 292 (2d Cir. 1990) (RA applies to all services offered by covered entity, not just those relating to entity's central function, so that school had an obligation to provide deaf parents of a hearing child with interpreters when they attended meetings to which all parents were invited); Bravin v. Mt. Sinai Med. Ctr., 58 F. Supp. 2d 269, 272 (S.D.N.Y. 1999) (where hospital offered service of Lamaze classes to mothers-to-be and their chosen partners, it was intentional discrimination under the RA to deny a sign language interpreter to a deaf partner, regardless of whether the mother-to-be could have attended the class alone); Aikins v. St. Helena Hosp., 843 F. Supp. 1329, 1337 (N.D. Cal. 1994) ("That Mrs. Aikins[, a deaf individual,] was not a patient at St. Helena should not preclude her from raising claims under the Rehabilitation Act based on the hospital's failure to communicate effectively with her in connection with its treatment of her [hearing] husband.").

24

absolute clarity, that this is the case here.[15]  Indeed, the record evidence -- the most

important pieces of which come from MRN itself -- nearly uniformly suggests that

MRN enacted and employed a discretionary policy that it believes "go[es] above

_____

[15] Judge Cox says that we should remand the mootness issue to the district court for further review.  On this record, we are unpersuaded that a remand would further the expeditious resolution of the matter.

Among other things, Judge Cox suggests that the district court found as a "critical fact" that "there was no real threat of a recurrent violation."  Op. Concurring in Part and Dissenting in Part at __, __ n.1.  We do not read the district court as ever having concluded that there was no real (prospective) threat of MRN returning to its old ways.  Rather, what the district court said in a brief concluding paragraph simply was that "[w]hile it may have taken this lawsuit to force such voluntary action, the record is clear that the written access policy is <u>now in force</u>, thus solving any problem that existed."  (R.1-47 at 15-16) (emphasis added).  This does not come close to determining that MRN poses no real threat of reverting to its old practices in the future.  We add that the district court never so much as cited, let alone applied, the controlling legal standard enunciated by the Supreme Court for determining whether voluntary private cessation mooted a case.  See <u>Laidlaw</u>, 528 U.S. at 190 ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is <u>absolutely</u> <u>clear</u> the allegedly wrongful behavior could not reasonably be expected to recur." (emphasis added)).

At the end of the day, however, we read the district court as having referenced the following three undisputed facts:  MRN consulted an ADA expert, established a written policy, and transmitted the policy to its employees.  These additional facts are undisputed: it took not only a lawsuit, but nine months of intensive litigation for MRN to change its policy on service animals; MRN has continued to assert that it did not violate the ADA or the RA; senior MRN officials had discussed MRN's service animal policy on several occasions; and prior to the events giving rise to this case, MRN had other run-ins with customers regarding service animals.  No matter how this undisputed record is interpreted, we are constrained to conclude that, as a matter of law -- and this is squarely a legal determination -- MRN cannot establish (indeed, has not even come close to establishing) that "it is <u>absolutely</u> <u>clear</u> the allegedly wrongful behavior could not reasonably be expected to recur."  <u>Id.</u> (emphasis added).  Accordingly, we can discern no reason for sending the question of mootness back to the district court for further review or fact finding.  See  <u>Coral Springs St. Sys., Inc. v. City of Sunrise</u>, 371 F.3d 1320, 1332 n.10 (11th Cir. 2004) ("[O]n numerous occasions, appellate courts have made this critical determination of whether reenactment of the challenged law was likely, without remand or deference to the district courts.  On the peculiar facts and circumstances of this case, we can discern no reason not to make a determination of this kind." (citations omitted)); <u>Nat'l Adver. Co. v. City of Miami</u>, 402 F.3d 1329, 1334 (11th Cir. 2005) (per curiam) (raising justiciability <u>sua</u> <u>sponte</u> and prefacing its mootness analysis as follows: "Given the legal framework for determining when subsequent events can moot a legal challenge, we apply those legal principles to the facts of this case.").

and beyond" the requirements of the law precisely because it preferred doing so to continued litigation. As MRN stresses on appeal, it has never before been sued for violating the ADA or the RA. Although the record shows that MRN has been faced with service animal issues on multiple occasions, apparently only Sheely took the trouble to press her claim in a court of law. If we conclude that her claims are moot, then should MRN determine that future litigation is unlikely, it may well calculate that its new policy is no longer the preferable course of action and revert to the old policy it prefers and apparently believes to be legal. On this fairly debatable record, MRN has not met its "formidable," "heavy burden" of meeting the Supreme Court's "stringent" standard for mootness in a private voluntary cessation case -- showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Laidlaw, 528 U.S. at 189 (internal quotation marks omitted). In short, we cannot say that this case is moot.[16]

---

[16] MRN made before the district court, and presses on appeal, an identical voluntary cessation argument under the doctrine of standing, urging that given its new service-animal policy, Sheely cannot show that the injury she alleges is redressable by the court. Although the Supreme Court has often remarked that "the doctrine of mootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)," the Court has also warned that this description of mootness "is not comprehensive" and that standing and mootness are in fact distinct doctrines which must not be confused. Laidlaw, 528 U.S. at 189-90 (internal quotation marks omitted). The difference between the two is that the latter, but not the former, has a "capable of repetition, yet evading review" exception. Id. at 190-91. Moreover, the "[s]tanding doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated . . . . To abandon the case at an advanced stage may prove more wasteful than frugal." Id. at 191-92.

26

III. Non-Economic Compensatory Damages Under the Rehabilitation Act

The district court also granted summary judgment to MRN on the remaining portion of Sheely's Rehabilitation Act claim that seeks non-economic compensatory damages, on the grounds that such damages are not recoverable under the Act. We consider what appears to be a question of first impression, not only in our Court but in all of the federal circuit courts of appeals,[17] and reverse.

As a result, "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." Id. at 190; see also id. at 190-91 (discussing City of Los Angeles v. Lyons, 461 U.S. 95 (1983), in which the Court "held that a plaintiff lacked initial standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat arising from the policy," but "noted that a citywide moratorium on police chokeholds -- an action that surely diminished the already slim likelihood that any particular individual would be choked by police -- would not have mooted an otherwise valid claim for injunctive relief, because the moratorium by its terms was not permanent," and Olmstead v. L.C., 527 U.S. 581, 594 n.6 (1999), in which the Court held that a patient's lawsuit challenging her confinement in a segregated institution was not mooted by her postcomplaint transfer to a community-based program, despite the fact that she would have lacked initial standing had she filed the complaint after the transfer).

As for MRN's argument that Sheely lacks standing to initiate the instant case because she only visited MRN's facility once and cannot show that she is at risk of suffering future discrimination, the district court found that in the eight months between the incident in question and her deposition testimony, Sheely had visited an MRI center twice for herself and twice more for her son, and therefore held that Sheely had provided more than mere assertions that she might theoretically return to MRN's facility for service. We agree that Sheely had standing to initiate this case.

[17] Federal circuit courts of appeals had, prior to the Supreme Court's important decision in Barnes v. Gorman, 536 U.S. 181 (2002), considered the availability of emotional damages under the RA. See, e.g., Schultz v. Young Men's Christian Ass'n of U.S., 139 F.3d 286, 290-91 (1st Cir. 1998) (denying emotional damages in case alleging unintentional discrimination); Eastman v. Va. Polytechnic Inst. & State Univ., 939 F.2d 204, 208 (4th Cir. 1991) (concluding that compensatory damages for pain and suffering are not available under Title VI or § 504 of the RA); Pandazides v. Va. Bd. of Educ., 13 F.3d 823, 830 (4th Cir. 1994) (overruling Eastman in light of Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), and holding that the "full panoply of legal remedies" is available under § 504, but not directly addressing emotional

27

In deciding what remedies, if any, are available under any statute, we begin our analysis, as we must, with the language of the statute itself. In this case, however, the statutory language does not take us far. Section 505(a)(2) of the Rehabilitation Act of 1973, as amended in 1978,[18] simply provides that "[t]he remedies . . . set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance . . . under [§ 504]." 29 U.S.C. § 794a(a)(2).[19] However, Title VI, 42

---

damages). However, we know of none that has done so since Barnes.

[18] See Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, sec. 120, § 505(a)(2), 92 Stat. 2955 (1978).

[19] It is not surprising that Congress tied the remedies available under § 504 to those that are available under Title VI. Section 504 of the RA, like other statutes that prohibit discrimination in federally assisted programs or activities, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12131-12165, was modeled after § 601 of Title VI. As a result, the language of § 504 is "virtually identical to that of § 601 of Title VI." Consol. Rail Corp. v. Darrone, 465 U.S. 624, 626 (1984); see also U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 600 & n.4 (1986). Compare § 601 of Title VI, 42 U.S.C. § 2000d (1964):

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

with § 901 of Title IX, 20 U.S.C. § 1681(a) (1972):

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

and § 504 of the RA, 29 U.S.C. § 794(a) (1973):

U.S.C. §2000d et seq., which prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, does not by itself expressly provide for a private cause of action, much less delineate specific judicial remedies. Instead, the Supreme Court, in interpreting Title VI, has "found an implied right of action, and Congress has acknowledged this right in amendments to the statute, leaving it beyond dispute that private individuals may sue to enforce Title VI." Barnes v. Gorman, 536 U.S. 181, 185 (2002) (citations, internal quotation marks, and emphasis omitted).

Thus, in determining whether emotional damages are available under § 504, we must ask what remedies the Supreme Court has allowed a private litigant suing under Title VI to recover, and why.

A.

Our consideration of the Supreme Court's Title VI jurisprudence yields the following principles. First, the Supreme Court has repeatedly held that where legal rights have been invaded and a cause of action is available, generally a federal court may use any available remedy to afford full relief, and that this presumption

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29

will yield <u>only</u> to a contrary congressional intent or statutory purpose. Second, with respect to legislation, like Title VI and the RA, enacted pursuant to Congress's Spending Clause power, the Supreme Court has said that the presumption must yield to <u>some</u> extent in order to accommodate the fact that remedies for violations of such legislation are proper only if funding recipients have fair notice that they may be subject to them. In articulating its concern with notice, the Court has sometimes found it useful to analogize Spending Clause legislation to a contract in which the federal government provides money to recipients in exchange for their promise not to discriminate against third parties.

Third, consistent with this contract metaphor, the Supreme Court has distinguished between intentional and unintentional violations of Spending Clause statutes. While the Court has suggested, without deciding, that victims of unintentional discrimination may be limited to prospective relief preventing future violations, it has clearly held that victims of intentional discrimination are additionally entitled to retrospective relief to compensate them for the recipient's past conduct, which the recipient knew or should have known violated the terms of its agreement with the government. In particular, victims of intentional discrimination may recover compensatory damages. Fourth, however, the Supreme Court has held that victims of intentional discrimination in violation of

30

Spending Clause legislation may not recover punitive damages. Because punitive damages are generally unavailable for breach of contract, the Court has explained, recipients lack fair notice that in accepting federal funds, they are subjecting themselves to this form of liability.

Although the Supreme Court has established beyond any doubt that victims of intentional discrimination may, under Title VI and therefore under the RA, recover compensatory damages as a broad category, the Court has not spoken to the precise scope of available compensatory damages under these statutes. After reviewing the Supreme Court's Title VI jurisprudence,[20] we conclude that non-economic compensatory damages are indeed available for intentional violations of the RA.

In Guardians Association v. Civil Service Commission of New York, 463 U.S. 582 (1983), the district court had awarded private plaintiffs "back seniority" in order "to make [them] 'whole' under Title VI," along with "corresponding monetary and nonmonetary entitlements . . . derived therefrom," and also ordered the employer to consult with the plaintiffs about future examinations. Id. at 588. Five Justices of the Supreme Court, in four separate opinions, held that no such

_____

[20] In the absence of any clear direction from Congress as to the remedies it intended to provide for violations of either Title VI or the subsequent statutes modeled on it, the Supreme Court has understandably struggled with these questions, and the jurisprudence we analyze today bears the deep marks of this struggle.

31

relief was available under Title VI,[21] while four Justices, in two separate opinions,

dissented.  As the number of opinions suggests, the Court was deeply divided in its

reasoning, and no clear rule emerged from Guardians.[22]  The general reasoning of

two opinions in that case, however, today appear to enjoy the support of the full

Court, and are therefore nevertheless worth discussing.

Justice White announced the decision of the Court in an opinion joined, in

relevant part, by Justice Rehnquist.  Justice White argued that private plaintiffs

pursuing claims of unintentional discrimination are entitled only to "declaratory

and injunctive relief ordering future compliance with the declared statutory and

_____

[21] Two argued that Title VI does not permit a private cause of action at all.  Id. at 608-10 (Powell, J., concurring in the judgment, joined by Burger, C.J.).  Four argued that the plaintiffs' claim for disparate impact, as opposed to discriminatory treatment, was not cognizable under Title VI.  Id. at 610-11 (Powell, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.); id. at 612 & n.1 (O'Connor, J., concurring in the judgment) (expressly reserving the question whether damages are available for claims of intentional discrimination).

[22] Less than a year after a badly fractured Court decided Guardians, a unanimous Court held, "[w]ithout determining the extent to which money damages are available under § 504, [that it is] clear that § 504 authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for backpay," reasoning this way:

> In Guardians, a majority of the Court expressed the view that a private plaintiff under Title VI could recover backpay; and no Member of the Court contended that backpay was unavailable, at least as a remedy for intentional discrimination. It is unnecessary to review here the grounds for this interpretation of Title VI.  It suffices to state that we now apply this interpretation to § 505(a)(2), which, as we have noted, provides to plaintiffs under § 504 the remedies set forth in Title VI. Therefore, respondent, having alleged intentional discrimination, may recover backpay in the present § 504 suit.

Consol. Rail Corp. v. Darrone, 465 U.S. 624, 630-31 (1984) (citation and footnotes omitted).

32

regulatory obligations. Additional relief in the form of money or otherwise based on past unintentional violations should be withheld." Id. at 598 (opinion of White, J.). While the "usual rule," he said, is that "where legal rights have been invaded and a cause of action is available, a federal court may use any available remedy to afford full relief," id. at 595 (citing Bell v. Hood, 327 U.S. 678, 684 (1946)), this rule "yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved," id. In statutes, like Title VI, enacted pursuant to Congress's Spending Clause power, "the receipt of federal funds . . . is a consensual matter," id. at 596 (citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 15 (1981), and Rosado v. Wyman, 397 U.S. 397, 420-21 (1970)):

> Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's . . . program will satisfy the conditions of the grant . . . . When in a later private suit brought by those for whose benefit the federal money was intended to be used it is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipt of federal money than assume the unanticipated burdens. . . . Although a court may identify the violation and enjoin its continuance or order recipients of federal funds prospectively to perform their duties incident to the receipt of federal money, the recipient has the option of withdrawing and hence terminating the prospective force of the injunction.

Id. Thus, in cases of unintentional discrimination, "it is not immediately obvious what the grantee's obligations under the federal program were and it is surely not

33

obvious that the grantee was aware that it was administering the program in violation of the statute or regulations." Id. at 598.

On the other hand, Justice White observed, "where intentional discrimination has been shown, there can be no question as to what the recipient's obligation under the program was and no question that the recipient was aware of that obligation. In such situations, it may be that the victim of the intentional discrimination should be entitled to a compensatory award, as well as to prospective relief in the event the State continues with the program." Id. at 597 (emphasis added); see also id. at 597 n.20.

Justice Marshall, while writing in dissent, agreed with Justice White that the issue required a reconciliation of the Bell v. Hood presumption of "any available remedy to make good the wrong done," id. at 624 (Marshall, J., dissenting), with Title VI's very nature as a "contractual" spending-power provision, id. at 633. However, Justice Marshall concluded that the contract analogy "only reinforces the propriety of awarding retrospective relief." Id. at 632.[23] Title VI, he said, "unambiguously imposes a condition [of nondiscrimination] on the grant of federal moneys," and this "statutory mandate can hardly escape notice": "applicants for

---

[23] Justice Marshall argued that private plaintiffs should be able to recover compensatory relief for both intentional and unintentional discrimination. See Guardians, 463 U.S. at 615 (Marshall, J., dissenting).

34

federal assistance literally sign contracts in which they agree to comply with Title VI and to 'immediately take any measures necessary' to do so. This assurance is given 'in consideration of' federal aid, and the Federal Government extends assistance 'in reliance on' the assurance of compliance." Id. at 629-30; see also id. at 630 nn.22-23 (quoting various agency implementing regulations and their "Assurance of Compliance" contracts with recipients of federal funds). This duty not to discriminate, he said, attaches when the recipient agrees to accept federal funding, not when a court concludes that it has breached that agreement. He thus called Justice White's suggestion that remedies for breach are limited to prospective relief "a bizarre view of contract law." Id. at 632. He concluded:

> Only by providing retrospective relief to private litigants can the courts fulfill the terms of the "contract" between the Federal Government and recipients of federal financial assistance. In exchange for federal moneys, recipients have promised not to discriminate. Because Title VI is intended to ensure that "no person" is subject to discrimination in federally assisted programs, private parties function as third-party beneficiaries to these contracts. When a court concludes that a recipient has breached its contract, it should enforce the broken promise by protecting the expectation that the recipient would not discriminate. The obvious way to do this is to put private parties in as good a position as they would have been had the contract been performed. This requires precisely the kind of make whole remedy that Justice White rejects . . . .

Id. at 632-33 (citations omitted). Denying plaintiffs compensatory relief would in fact, he said, often leave Title VI victims remediless, and would thereby

35

"depreciate[] [Title VI], which was specifically intended to deal with 'the injustices and humiliations of racial and other discrimination.'" Id. at 625-26 (quoting H.R. Rep. No. 914, 88th Cong., 1st Sess. at 18 (1963), as reprinted in 1964 U.S.C.C.A.N. 2391, 2394 (emphasis added)).

After Guardians, perhaps the only thing federal courts considering the available remedies under the RA and other Title VI-based statutes have agreed on was that the question was "'murky.'" See, e.g., Manecke v. Sch. Bd. of Pinellas County, 762 F.2d 912, 921 n.8 (11th Cir. 1985) (quoting with approval Parks v. Pavkovic, 753 F.2d 1397, 1409 (7th Cir. 1985)). Even the Supreme Court had to admit, "[w]ithout expressing an opinion on the matter," to "some confusion among the Circuits as to the availability of a damages remedy under § 504." Smith v. Robinson, 468 U.S. 992, 1020 n.24 (1984).

Against this background of uncertainty, a panel of this Court held, in Franklin v. Gwinnett County Public Schools, 911 F.2d 617 (11th Cir. 1990), that compensatory relief was unavailable to private plaintiffs for intentional violations of Title IX. Id. at 622. The plaintiff in that case was a high school student who alleged that she had been sexually harassed by her coach and teacher; by the time the appeals panel considered her claim for compensatory damages, she had graduated and the teacher had resigned, so that no other form of relief would have

36

benefitted her.  Nevertheless, the panel read <u>Guardians</u> as leaving open the question of damages for intentional violations of Title VI (and thus Title IX[24]), and instead followed the binding case of <u>Drayden v. Needville Independent School District</u>, 642 F.2d 129 (5th Cir. Unit A Apr. 1981), where the Court had held that Title VI's private right of action "encompasses <u>no more</u> than an attempt to have any discriminatory activity ceased."  <u>Franklin</u>, 911 F.2d at 620 (quoting <u>Drayden</u>, 642 F.2d at 133).  The panel majority[25] noted, in addition, that Justice White's opinion in <u>Guardians</u> provided "important guidance," agreeing with Justice White that where Spending Clause legislation is at issue, "relief may frequently be limited to that which is equitable in nature, with the recipient of federal funds thus retaining the option of terminating such receipt in order to rid itself of an injunction."  <u>Id.</u> at 621.

On review, however, all nine Justices of the Supreme Court agreed that "a damages remedy" is indeed available under Title IX, and reversed.  <u>Franklin</u>, 503 U.S. 58, 76 (1992); <u>see also</u> <u>id.</u> at 78 (Scalia, J., concurring in the judgment, joined by Rehnquist, C.J., and Thomas, J.).  Justice White, writing for the Court, began by

---

[24] The parties agreed that Title VI "served as the legislative antecedent for Title IX, and that consequently, the jurisprudential analysis of the Justices' opinions in <u>Guardians</u> . . . is applicable in a Title IX context."  <u>Franklin</u>, 911 F.2d at 619 (citation and footnote omitted).

[25] Judge Johnson concurred specially to state that he would have based the panel's decision on <u>Drayden</u> alone, without considering the "dicta" in Justice White's opinion in <u>Guardians</u>.

reiterating <u>Bell v. Hood</u>'s presumption that "although we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." <u>Id.</u> at 66 (majority opinion) (citation omitted); <u>see also id.</u> at 66-68. He emphasized that this "general rule" had "deep roots in [the Court's] jurisprudence," <u>id.</u> at 66, and was the result of a "long line of cases," <u>id.</u> at 69, and that <u>Guardians</u> and <u>Consolidated Rail Corp. v. Darrone</u>, 465 U.S. 624 (1984) (<u>see supra</u> n.21), far from "erod[ing] this traditional presumption, . . . in fact support it," <u>id.</u> at 70:

> [A] clear majority [in <u>Guardians</u>] expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action. The correctness of this inference was made clear the following Term [in <u>Consolidated Rail</u>] when the Court unanimously held that the [RA] . . . authorizes an award of backpay. . . . The general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

<u>Id.</u> at 70-71 (citations omitted).

The Court concluded that "Congress intended to limit [neither] application of this general principle in the enforcement of Title IX" nor "the remedies available in a suit brought under Title IX." <u>Id.</u> at 71-72. After the courts had

38

recognized an implied private right of action under Title IX, Congress passed two amendments to Title IX -- as well as to Title VI, § 504 of the RA, and the Age Discrimination Act of 1975.

In the first, the Rehabilitation Act Amendments of 1986 § 1003(a)(2), Pub. L. No. 99-506, 100 Stat. 1845, Congress abrogated the States' Eleventh Amendment immunity under all four statutes, providing in pertinent part that "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d-7(a)(2). The Supreme Court determined that "[w]hile it is true that this saving clause says nothing about the nature of those other available remedies, absent any contrary indication in the text or history of the statute, we presume Congress enacted this statute with the prevailing traditional rule in mind." Franklin, 503 U.S. at 73 (citation omitted); see also id. at 78 (Scalia, J., concurring in the judgment) ("Because of legislation enacted subsequent to [Supreme Court case law finding an implied private right of action under Title IX], it is too late in the day to address whether a judicially implied exclusion of damages under Title IX would be appropriate. The Rehabilitation Act Amendments of 1986 must be read . . . as an implicit acknowledgment that damages are available." (citations

39

omitted)).

The second amendment, the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28, "broadened the coverage of [the same four] antidiscrimination provisions" while again making "no effort to restrict the right of action . . . or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right." Franklin, 503 U.S. at 73.

Finally, the Supreme Court rejected this Circuit's argument that "the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to Congress' Spending Clause power." Id. at 74 (majority opinion). "[R]emedies [a]re limited under such Spending Clause statutes," the Court explained, "when the alleged violation was unintentional," but the Court declined the defendant's invitation to extend this rule to intentional violations. Id. "[T]he point of not permitting monetary damages for an unintentional violation," it said, "is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case . . . in which intentional discrimination is alleged." Id. at 74-75 (citation omitted).[26]

Whatever may or may not have been clear before, after Franklin, a "damages

---

[26] The Court noted that, in any case, its unanimous decision in Consolidated Rail had foreclosed the argument "that Spending Clause statutes do not authorize monetary awards for intentional violations." Franklin, 503 U.S. at 75.

40

remedy" for <u>intentional</u> violations by federal funding recipients is plainly available under Title VI, and thus under § 504 of the RA as well.  In holding that equitable <u>and</u> monetary remedies are available under Spending Clause legislation, however, the Supreme Court spoke only in terms of broad <u>categories</u> of remedies.  It was not until <u>Barnes v. Gorman</u>, 536 U.S. 181 (2002), that the Court began to address the narrower question of which specific <u>kinds</u> of damages may be available.

The plaintiff in <u>Barnes</u> sued under § 202 of the ADA and § 504 of the RA, and a jury awarded him $1 million in compensatory damages and $1.2 million in punitive damages.  The district court, however, vacated the punitive damages award, holding that they are unavailable under the statutes.  The Eighth Circuit reversed, relying on <u>Franklin</u>'s emphasis on the <u>Bell v. Hood</u> presumption that "absent clear direction to the contrary by Congress, the federal courts have the power to award <u>any</u> appropriate relief in a cognizable cause of action brought pursuant to a federal statute."  <u>Id.</u> at 184 (quoting <u>Franklin</u>, 503 U.S. at 70-71) (emphasis added).  The appeals court held that punitive damages, which it described as "'an integral part of the common law tradition and the judicial arsenal,'" were therefore appropriate.  <u>Id.</u> (quoting <u>Gorman v. Easley</u>, 257 F.3d 738, 745 (8th Cir. 2001)).

All nine Justices of the Supreme Court once again agreed, in two separate

41

opinions, to reverse. The majority began by noting that "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI." Id. at 185. Although the Court said it was "beyond dispute that private individuals may sue to enforce Title VI," it was "less clear what remedies are available in such a suit":

> In Franklin, we recognized "the traditional presumption in favor of any appropriate relief for violation of a federal right," and held that since this presumption applies to suits under Title IX of the Education Amendment of 1972, monetary damages were available. And the Court has interpreted Title IX consistently with Title VI. Franklin, however, did not describe the scope of "appropriate relief." We take up this question today.

Id. (citations omitted; emphasis in Barnes).

In holding that punitive damages are not available under Title VI, § 202 of the ADA, or § 504 of the RA, id. at 189, the Supreme Court explained that it had

> repeatedly characterized [Title VI] and other Spending Clause legislation as much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions. Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the "contract."

Id. at 186 (internal quotation marks, alterations, emphasis, and citations omitted) (citing Pennhurst, the opinions of Justices White and Marshall in Guardians, and

42

various Title IX cases). Previously, the Court said, it had applied the contract

analogy (1) in <u>Franklin</u>, "in finding a damages remedy available in private suits

under Spending Clause legislation," and (2) in "defining the scope of conduct for

which funding recipients may be held liable for money damages," with the result

that a recipient is liable to third-party beneficiaries only for "intentional conduct

that violates the clear terms of the relevant statute, but not for its failure to comply

with vague language describing the objectives of the statute." <u>Id.</u> at 186-87

(citation omitted).

"The same analogy applies," the Court said, "in determining the <u>scope</u> of

damages remedies," <u>id.</u> at 187:

> a remedy is appropriate relief only if the funding recipient is on notice
> that, by accepting federal funding, it exposes itself to liability of that
> nature. A funding recipient is generally on notice that it is subject not
> only to those remedies explicitly provided in the relevant legislation,
> but also to those remedies traditionally available in suits for breach of
> contract.

<u>Id.</u> (internal quotation marks, emphasis, and citation omitted). Because "punitive

damages, unlike compensatory damages and injunction, are generally not available

for breach of contract," <u>id.</u> at 187-88 (citing Restatement (Second) of Contracts §§

355, 357 (1981) and various treatises on contract law and damages), and because

Title VI, which "mentions no remedies," does not otherwise clearly contemplate

the possibility of punitive damages, funding recipients are not on notice that they

43

are subject to such damages, id. at 187.  Nor can recipients be said to have implicitly consented to be liable for punitive damages, since it is unlikely that they would have agreed to such "unusual and disproportionate exposure."  Id. at 188.

Significantly for the question we address today, the Court did not reject but instead took pains to harmonize its holding in Barnes with Bell v. Hood's "well-settled rule," reiterated in Franklin, that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done," id. at 189 (internal quotation marks omitted):

> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient compensates the Federal Government or a third-party beneficiary . . . for the loss caused by that failure.  See Guardians, 463 U.S. at 633 (Marshall, J., dissenting) ("When a court concludes that a recipient has breached its contract, it should enforce the broken promise by protecting the expectation that the recipient would not discriminate. . . . The obvious way to do this is to put private parties in as good a position as they would have been had the contract been performed").  Punitive damages are not compensatory, and are therefore not embraced within the rule described in Bell.

Id.

B.

Contrary to Sheely's suggestion, Franklin did not hold that all forms of damages, including non-economic compensatory damages, are available under

44

Spending Clause legislation. Contrary to MRN's contentions, however, Barnes did not hold that such damages are unavailable. Franklin merely teaches that in addition to injunctive relief, monetary damages, as a broad category, are available under the RA. Barnes, in turn, clarifies that one particular form of damages -- punitive damages -- is not available. The open question before us today is narrower still: whether a subset of compensatory damages -- non-economic compensatory damages -- is available under § 504 of the Rehabilitation Act for intentional discrimination. We hold that it is.

First, the Barnes Court's central reason for turning to the contract metaphor appears to be its concern with ensuring that federal funding recipients have fair notice of any liability to which they are subject by federal courts. We think it fairly obvious -- and case law supports the conclusion -- that a frequent consequence of discrimination is that the victim will suffer emotional distress. As a result, emotional distress is a foreseeable consequence of funding recipients' "breach" of their "contract" with the federal government not to discriminate against third parties, and they therefore have fair notice that they may be subject to liability for emotional damages. Second, although the Supreme Court has made clear that the contract metaphor used to analyze appropriate relief under Spending Clause legislation is just that, even applying contract law directly to the question at

45

hand would yield the answer that emotional damages are recoverable under the RA.  Finally, given that permitting recovery of emotional damages will not contradict the nature of the RA as Spending Clause legislation or, as far as we can discern, otherwise interfere with Congress's intent, we are bound by Bell v. Hood's presumption that "federal courts may use any available remedy to make good the wrong done."  Emotional damages are plainly a form of compensatory damages designed to "make good the wrong done," and we have particular reason to exercise our discretion to award them where, as here, emotional distress is the only alleged damage to the victim and thus the only "available remedy to make good the wrong done."  We take these points in order.

1.

As the Barnes Court's concern with notice plainly reflects, a basic and longstanding rule of contract law is that "[d]amages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."  Restatement (Second) of Contracts § 351 (1981); see also Hadley v. Baxendale, 156 Eng. Rep. 145 (Ex. 1854) (recoverable damages are those that naturally result from the breach, or are the consequences of special or unusual circumstances which are in the reasonable contemplation of the parties when making the contract).

As a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of discrimination.  Certainly, federal courts have long found that violations of the RA and other antidiscrimination statutes frequently and palpably result in emotional distress to the victims.  See, e.g., Bogle v. McClure, 332 F.3d 1347, 1354, 1359 (11th Cir. 2003) (affirming award of emotional damages for race discrimination in violation of 42 U.S.C. § 1983, where plaintiffs testified to having felt "embarrassed, humiliated, stunned, confused, angry, frightened, discouraged, and betrayed," with one testifying, "I can't begin to tell you what a toll it has taken on me.  To be an active and producing person and then to suddenly be just put on the shelf and made to sit there through no purpose of my own or no doing of my own, I could not help that I was hurt"); Ferrill v. Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999) (affirming award of emotional damages for race discrimination in violation of 42 U.S.C. § 1981); Stallworth v. Shuler, 777 F.2d 1431, 1435 (11th Cir. 1985) (upholding award of emotional damages under §§ 1981 and 1983, noting that "[t]he injury in civil rights cases may be intangible as here.  It need not be financial or physical but may include damages for humiliation and emotional distress"); Aaron v. Ward, 96 N.E. 736, 737-38 (N.Y. 1911) (awarding emotional damages to ticketed bathhouse guest denied access and referred to by a derogatory term for one

47

of Jewish ancestry); Odom v. E. Ave. Corp., 34 N.Y.S.2d 312, 314-16 (N.Y. Sup. Ct. 1942) (awarding emotional damages to African-American hotel guests denied service at hotel restaurant because of their race); see also Doe v. Dist. of Columbia, 796 F. Supp. 559, 565, 573 (D.D.C. 1992); Recanzone v. Washoe County Sch. Dist., 696 F. Supp. 1372, 1373, 1378 (D. Nev. 1988).

The frequency and acuteness with which discrimination spawns emotional distress in the victim suggest that emotional distress is a "probable result," Restatement (Second) of Contracts § 351, of funding recipients' breach of their promise not to discriminate, and thus that recipients have fair notice that, in breaching, they may be subject to liability for emotional damages. Similarly, whereas punitive damages "may range in orders of 'indeterminate magnitude,' untethered to compensable harm, and would thus pose a concern that recipients of federal funding could not reasonably have anticipated," Barnes, 536 U.S. at 190-91 (Souter, J., concurring) (quoting majority opinion at 188), emotional damages, like other forms of compensatory damages, are designed to make the plaintiff whole, and therefore bear a significant and altogether determinable relationship to events in which the defendant entity participated and could have foreseen.

2.

In utilizing the contract analogy, the Barnes Court's primary concern was

48

the notice problem we just discussed, and every Member of that Court, in three

separate opinions, emphasized the limits of the contract law analogy the Court used

to discuss this notice problem.[27]  However, even assuming that Barnes stands not

just for the proposition that a contract metaphor is illuminating in determining the

available remedies under Spending Clause legislation, but also for the proposition

that contract law applies more directly to the question at hand, we think this body

of common law would still yield the conclusion that emotional damages are

recoverable for intentional violations of § 504 of the RA.

Although the general rule is that emotional damages for breach of contract

---

[27] The majority, for instance, was careful to note:

Our decision merely applies a principle expressed and applied many times before:
that the contractual nature of Spending Clause legislation has implications for our
construction of the scope of available remedies.  We do not imply, for example,
that suits under Spending Clause legislation are suits in contract, or that
contract-law principles apply to all issues that they raise.

Barnes, 536 U.S. at 188 n.2 (internal quotation marks and citation omitted; emphasis in original);
see also id. at 186 ("[W]e have been careful not to imply that all contract-law rules apply to
Spending Clause legislation.").  Justice Souter, in a concurrence in which Justice O'Connor
joined, said that he

read the Court's opinion as acknowledging[] that the contract-law analogy may
fail to give such helpfully clear answers to other questions that may be raised by
actions for private recovery under Spending Clause legislation, such as the proper
measure of compensatory damages.

Id. at 191 (Souter, J., concurring) (emphasis added).  Finally, Justice Stevens, joined by Justices
Ginsburg and Breyer, concurred in the judgment only, and noted that the majority's "novel
reliance on what has been, at most, a useful analogy to contract law has potentially far-reaching
consequences that go well beyond the issues briefed and argued in this case."  Id. at 192-93
(Stevens, J., concurring in the judgment).

will not lie, see Restatement (Second) of Contracts § 353, this rule is simply a shorthand way of saying that emotional distress is usually not a foreseeable consequence of breach. But when the nature of the contract is such that emotional distress is foreseeable, emotional damages will lie:

> It is true, in the ordinary commercial contract, damages are not recoverable for disappointment, even amounting to alleged anguish, because of breach. Such damages are . . . too remote. But these are contracts entered into for the accomplishment of a commercial purpose. Pecuniary interests are paramount. . . . [I]t has long been settled that recovery therefor was not contemplated by the parties as the natural and probable result of the breach. Yet not all contracts are purely commercial in their nature. Some involve rights we cherish, dignities we respect, emotions recognized by all as both sacred and personal. In such cases the award of damages for mental distress and suffering is a commonplace . . . .

Stewart v. Rudner, 84 N.W.2d 816, 823 (Mich. 1957) (internal quotation marks and citations omitted).

Thus, the current Restatement rule is that a breached-upon party actually may recover emotional damages whenever "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts § 353; see also 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.17 (3d ed. 2004) (explaining that some courts have awarded emotional damages where the nature of the contract made emotional distress a "particularly likely result" of breach, while others have awarded such

damages based on the "reprehensible" nature of the breach); 24 Richard A. Lord, Williston on Contracts § 64:7 (4th ed. 2002) ("[W]here other than pecuniary benefits are contracted for, damages have been allowed for injury to a person's feelings."); 25 C.J.S. Damages § 100 (explaining that "[w]here the character of the contract is of such a nature that a natural and probable consequence of the breach will be to inflict mental pain or anguish . . ., the parties may be presumed to have contracted with respect to mental anguish as an element of damages and a recovery may be had therefor," and noting that such contracts include "noncommercial contracts, . . . or contracts involving rights cherished, dignities respected, and emotions recognized by all as both sacred and personal").

Courts, too, have embraced the idea that emotional damages may lie for breach of "personal" contracts. See, e.g., Sullivan v. O'Connor, 296 N.E.2d 183, 188-89 (Mass. 1973) ("[T]here is no general rule barring [emotional damages] in actions for breach of contract. It is all a question of the subject matter and background of the contract . . . ."); Stewart, 84 N.W.2d at 822 ("[O]bjections to recovery for mental disturbance, applicable equally to tort and contract actions, have been so thoroughly demolished in recent years that we will not take the time for review."); id. at 824 ("[There is] a clear exception to the 'rule' (if there now is any such) that damages for mental suffering are not recoverable in contract actions.

51

They are. When we have a contract concerned . . . not with pecuniary

aggrandizement but with matters of mental concern and solicitude, then a breach . .

. will inevitably and necessarily result in mental anguish, pain and suffering. . . .

Far from being outside the contemplation of the parties [emotional damages] are an

integral and inseparable part of it."); Lamm v. Shingleton, 55 S.E.2d 810, 813

(N.C. 1949) (noting the "trend of modern decisions" that emotional damages are

recoverable "[w]here the contract is personal in nature and the contractual duty . . .

is so coupled with matters of mental concern or solicitude, or with the sensibilities

of the party . . . [that] it should be known to the parties . . . that [mental] suffering

will result from its breach").[28]

---

[28] One category of contracts whose breach is deemed "particularly likely to cause serious emotional disturbance" are "contracts of carriers and innkeepers with passengers and guests." Restatement (Second) of Contracts § 353 cmt. a. As a result, entities that we would today refer to as places of public accommodation have long been held liable for emotional damages under a breach of contract theory. See, e.g., Boyce v. Greely Square Hotel Co., 126 N.E. 647 (N.Y. 1920) (emotional damages awarded for operator's insulting behavior toward hotel guest); Gillespie v. Brooklyn Heights R.R. Co., 70 N.E. 857 (N.Y. 1904) (same, toward train passenger); Odom, 34 N.Y.S.2d at 314-16 (emotional damages awarded for racial discrimination against hotel guest denied access to restaurant). Although MRN is not, of course, an inn or a common carrier, some courts have found other entities to be sufficiently analogous to inns and carriers as to justify the recovery of emotional damages by patrons for the entity's discrimination. See, e.g., Aaron, 96 N.E. at 737-38 (acknowledging the "distinction between common carriers and innkeepers, who are obliged to serve all persons who seek accommodation from them, and the keepers of public places of amusement or resort, such as the bathhouse of the defendant, theaters, and the like. . . . [which] may discriminate and serve whom [they] please[]," but holding that the latter class of businesses "cannot be said to be 'strictly' private," and that although "the plaintiff might have been denied admission altogether to the defendant's bathhouse, . . . the defendant having voluntarily entered into a contract with her admitting her to the premises and agreeing to afford facilities for bathing, her status became similar to that of a passenger of a common carrier or a guest of an innkeeper," so that she, too, was entitled to recover emotional damages for "improper expulsion" by anti-Semitic operator). Moreover, the

Under contract law, the notable and longstanding exception permitting

emotional damages for breach of personal contracts sharply distinguishes the

emotional damages Sheely seeks from the punitive damages the Supreme Court

_____

rationale for finding an implied contractual promise of decent treatment by innkeepers, common carriers, and their analogs foreshadows some aspects of modern public accommodations law:

> [T]he business of an innkeeper is of a quasi public character, invested with many privileges, and burdened with correspondingly great responsibilities. . . . The innkeeper holds himself out as able and willing to entertain guests for hire . . . . One of the things which a guest for hire at a public inn has the right to insist upon is respectful and decent treatment at the hands of the innkeeper and his servants. That is an essential part of the contract whether it is express or implied. This right of the guest necessarily implies an obligation on the part of the innkeeper that neither he nor his servants will abuse or insult the guest, or indulge in any conduct or speech that may unnecessarily bring upon him physical discomfort or distress of mind.

De Wolf v. Ford, 86 N.E. 527, 529-30 (N.Y. 1908); see also Aaron, 96 N.E. at 738; Gillespie, 70 N.E. at 859.

Modern courts have gone even further beyond the innkeeper/common carrier exception and found emotional damages available for breaches of a truly wide range of contracts. See, e.g., Munday v. Waste Mgmt. of N. Am., Inc., 997 F. Supp. 681 (D. Md. 1998) (breach of settlement agreement where employer retaliated against employee who had brought sex discrimination and sexual harassment suit); Huskey v. Nat'l Broad. Co., 632 F. Supp. 1282, 1292-93 (N.D. Ill. 1986) (breach of contract to protect privacy of filmed individuals by blurring their faces); Sexton v. St. Clair Fed. Sav. Bank, 653 So. 2d 959, 961-62 (Ala. 1995) (breach of contract pertaining to the construction of plaintiffs' residence); Gruenberg v. Aetna Ins. Co., 510 P.2d 1032, 1042 (Cal. 1973) (breach of insurance contract for bad faith denial of business's claims); Decker v. Browning-Ferris Indus. of Colo., Inc., 931 P.2d 436, 447-48 (Colo. 1997) (breach of employment contract where employer terminated employees in violation of company's progressive disciplinary policy); Doe v. Roe, 681 N.E2d. 640, 650-51 (Ill. App. Ct. 1997) (breach of lawyer's fiduciary duty to his client); McManus v. Galaxy Carpet Mills, Inc., 433 So. 2d 854 (La. Ct. App. 1983) (breach of contract to provide non-defective carpeting, where "intellectual enjoyment was a principal object of the contract"); Sullivan, 296 N.E.2d at 188-89 (breach of contract to aesthetically improve nose through rhinoplasty); Stewart, 84 N.W.2d at 825 (breach of physician's promise to perform a Caesarean section); Lamm, 55 S.E.2d at 812-14 (breach of contract to provide leakproof casket). If these contracts are personal enough to permit recovery for emotional damages, we think there can be little doubt that contracts not to discriminate are also sufficiently personal.

refused to award under the RA in <u>Barnes</u>.[29]

3.

Having concluded that neither the contract <u>metaphor</u> the Supreme Court has found useful in determining the available remedies under Spending Clause legislation nor <u>actual</u> contract law bars recovery of emotional damages, we turn to the <u>Bell v. Hood</u> presumption, which the <u>Barnes</u> Court reaffirmed, that "federal courts may use <u>any</u> available remedy to make good the wrong done." <u>Barnes</u>, 536 U.S. at 189 (emphasis added).

Once again, we see a striking difference between the punitive damages rejected in <u>Barnes</u> and the emotional damages at issue today. Whereas punitive damages "are not compensatory, and are therefore not embraced within the rule described in <u>Bell</u>," <u>id.</u> at 189, emotional damages are plainly a form of compensatory damages designed to "make good the wrong done."[30] We are

---

[29] In fact, the very same section of the Restatement that the <u>Barnes</u> Court cited for the proposition that punitive damages are unavailable for breach of contract, <u>see</u> <u>Barnes</u>, 536 U.S. at 187-88, illustrates that non-economic compensatory damages are recoverable in certain circumstances. <u>See</u> Restatement (Second) of Contracts § 355 cmt. a, illus. 1 ("A is employed as a school teacher by B. In breach of contract and without notice B discharges A by excluding him from the school building and by stating in the presence of the pupils that he is discharged. Regardless of B's motive in discharging A, <u>A cannot recover punitive damages</u> from B. <u>A can recover compensatory damages</u> under the rule stated in § 347, <u>including any damages for emotional disturbance</u> that are allowable under the rule stated in § 353." (emphasis added)).

[30] <u>See, e.g.</u>, <u>Memphis Cmty. Sch. Dist. v. Stachura</u>, 477 U.S. 299, 307 (1986) ("[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering." (internal quotation marks and alteration omitted)); <u>Carey v. Piphus</u>, 435 U.S. 247,

54

therefore unpersuaded by the district court's brief discussion holding that emotional damages are barred by <u>Barnes</u>'s rule that "only compensatory damages for failing to provide the contractual obligation are recoverable." Order at 12 (relying on the equally brief decision in <u>Witbeck v. Embry-Riddle Aeronautical Univ., Inc.</u>, 269 F. Supp. 2d 1338, 1340 (M.D. Fla. 2003), which itself relied only on two pre-<u>Franklin</u>, pre-<u>Barnes</u> district court cases for the proposition that emotional damages are unavailable under the RA).

Moreover, such damages are particularly appropriate where, as here, emotional distress is the only alleged damage to the victim and thus the <u>only</u> "available remedy to make good the wrong done," <u>Franklin</u>, 503 U.S. at 66 (quoting <u>Bell</u>, 327 U.S. at 684), and the <u>only</u> way to "put private parties in as good a position as they would have been had the contract been performed," <u>Barnes</u>, 536

254, 264 (1978) (holding that "the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights," and that "mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983"); <u>Banai v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Times</u>, 102 F.3d 1203, 1207 & n.4 (11th Cir. 1997) (holding that "anger, embarrassment, and emotional distress are clearly compensable injuries under th[e] standard" of the Fair Housing Act, 42 U.S.C. § 3601 <u>et seq.</u>, which permits recovery of "actual damages" -- that is, damages which constitute "compensation for the victim's injuries, not punishment for the perpetrator's wrongdoing"); 25 C.J.S. Damages § 94 ("[M]ental pain and suffering . . . is an element of actual or compensatory, as distinguished from exemplary or punitive, damages." (citing, <u>inter alia</u>, <u>Amos v. Prom, Inc.</u>, 115 F. Supp. 127, 131, 132 (N.D. Iowa 1953) (holding, in case where plaintiff alleged she was "intentionally and maliciously refused admission to defendant's ballroom solely because she is [black]," in violation of a state civil rights statute, that "[d]amages for emotional distress or mental suffering or humiliation are compensatory, not exemplary"))).

U.S. at 189 (internal quotation marks omitted); see Franklin, 503 U.S. at 75-76 (rejecting the argument that Title IX relief should be limited to backpay and prospective damages in part because such damages would offer no relief where neither the plaintiff student nor her alleged harasser continued to attend the school); cf. Lamm, 55 S.E.2d at 813 ("The contract [to inter a body] was predominantly personal in nature and no substantial pecuniary loss would follow its breach. [The widow plaintiff's] mental concern, her sensibilities, and her solicitude were the prime considerations for the contract . . . .").

C.

When an entity accepts funding from the federal government, it does so in exchange for a promise not to discriminate against third-party users of its services. A foreseeable consequence of discrimination is emotional distress to the victim, and emotional damages have long been available for contract breach in the public accommodations context. Thus, where one of the benefits the government has bargained for is the funding recipient's promise not to discriminate, the recipient cannot claim to lack fair notice that it may be liable for emotional damages when it intentionally breaches that promise. The Supreme Court's concern with notice in awarding remedies for violations of Spending Clause legislation -- which operates as a constraint on the Bell v. Hood presumption -- is thus satisfied, and we are

56

obliged to adhere to Bell's presumption that we may award "any available remedy to make good the wrong done." In short, we conclude that emotional damages are available to make whole the victims of violations of § 504 of the Rehabilitation Act, and accordingly, we reverse the district court.

## IV. Florida Civil Rights Act

Although we have reversed on Sheely's claims under the ADA and the RA, we affirm the district court's grant of summary judgment to MRN on Sheely's state law claim under the Florida Civil Rights Act, Fla. Stat. §760.01 et seq. ("FCRA"). That statute provides for a private right of action for violation of any Florida discrimination statute, and Florida Statutes §§ 413.08 and 413.081, in turn, provide that disabled individuals have the right to be accompanied by service animals in places of public accommodation. The district court held that the FCRA's narrow definition of "public accommodation" does not apply to MRN, and that Sheely may not "import" § 413.08's broader definition of "public accommodation" into the FCRA. We agree.

Section 760.07 of the FCRA provides that "[a]ny violation of any Florida statute making unlawful discrimination because of . . . handicap . . . in the area[] of . . . public accommodations gives rise to a cause of action for all relief and damages described in § 760.11(5), unless greater damages are expressly provided

57

for." Section 760.02(11) provides that "[f]or the purposes of §§ 760.01-760.11 and 509.092" -- i.e., for purposes of § 760.07 --

"Public accommodations" means places of public accommodation, lodgings, facilities principally engaged in selling food for consumption on the premises, gasoline stations, places of exhibition or entertainment, and other covered establishments. Each of the following establishments which serves the public is a place of public accommodation within the meaning of this section:

(a) Any inn, hotel, motel . . . .
(b) Any . . . facility principally engaged in selling food . . . .
(c) Any . . . place of exhibition or entertainment. . . .

Thus, § 760.02(11)'s definition of "public accommodations" does not include medical facilities like MRN.

Sheely does not contend otherwise. Instead, she notes that MRN is a place of public accommodation under Florida's separate service animal statute, and argues that this provides her with a private right of action against MRN under the FCRA. We are not persuaded. Florida Statute § 413.08 provides that "[a]n individual with a disability has the right to be accompanied by a service animal in all areas of a public accommodation that the public or customers are normally permitted to occupy," id. § 413.08(3), and defines "public accommodation" broadly to include "places to which the general public is invited," id. § 413.08(1)(c). Although § 760.07 of the FCRA provides a private right of action for "any Florida statute" making discrimination in places of public accommodation

58

unlawful, § 760.02 of the FCRA expressly states that its narrow definition of "public accommodation" applies to § 760.07. Sheely therefore may not import § 413.08's broader definition of "public accommodation" into the FCRA. As the district court noted, this conclusion does not gut § 760.07. If MRN were a lodging, food, or entertainment establishment, § 760.07 would provide a private right of action for a violation of § 413.08.

Moreover, Sheely has failed to exhaust her administrative remedies under the FCRA. The Act provides that "[a]ny person aggrieved by a violation of §§ 760.01-760.10 may file a complaint with the [Florida] [C]ommission [on Human Relations] within 365 days of the alleged violation . . . . [or] with the federal Equal Employment Opportunity Commission or with any unit of government of the state which is a fair-employment-practice agency under 29 C.F.R. §§ 1601.70-1601.80." Id. § 760.11(1). "Within 180 days of the filing of the complaint, the commission shall determine if there is reasonable cause to believe that [a] discriminatory practice has occurred in violation of the Florida Civil Rights Act of 1992." Id. § 760.11(3). "In the event that the commission determines that there is reasonable cause to believe that a discriminatory practice has occurred . . ., the aggrieved person may . . . [b]ring a civil action . . . in any court of competent jurisdiction . . . ." Id. § 760.11(4)(a) (emphasis added). However, "[i]f the commission determines

59

that there is not reasonable cause . . ., the commission shall dismiss the complaint. . . . If the aggrieved person does not request an administrative hearing within . . . 35 days, the claim will be barred." Id. § 760.11(7).

Although Sheely timely filed a complaint with the Commission, it apparently concluded that there was not reasonable cause to believe that a discriminatory practice had occurred in violation of the FCRA. The Commission's letter to Sheely states that "[b]ased on the information you provided, we are unable to pursue this matter further" because § 760.02(11)'s definition of public accommodation does not apply to MRN. "Under these circumstances," the letter concluded, "unless you advise us within 10 days . . . that the information on which we have based our decision is incorrect, we will take no further action on your inquiry."[31] There is no evidence in the record that Sheely provided the Commission with further information within 10 days under the terms of the letter, or that she requested an administrative hearing within 35 days under § 760.11(7). As a result, Sheely failed to exhaust her administrative remedies under the Act.[32]

---

[31] Although the Commission's July 21, 2005, letter to Sheely did not expressly state that the Commission found no "reasonable cause," and although § 760.11(8) provides that if "the commission fails to conciliate or determine whether there is reasonable cause on any complaint under this section within 180 days of the filing of the complaint, an aggrieved person may proceed under subsection (4), as if the commission determined that there was reasonable cause," we read the Commission's letter as reporting to Sheely a finding of no reasonable cause.

[32] Contrary to Sheely's suggestion, the fact that the district court did not reach this issue is irrelevant. We can affirm the district court so long as "the judgment entered is correct on any

For these reasons, the district court properly granted summary judgment to MRN on Sheely's state law claim.

## V.  Conclusion

Because MRN has not met its burden of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," Laidlaw, 528 U.S. at 189 (internal quotation marks omitted), this case is not moot. Further, we hold for the first time that non-economic compensatory damages are available under the Rehabilitation Act.  We therefore reverse the district court's holdings on these two issues and remand for further proceedings consistent with this opinion.  However, we affirm the district court's grant of summary judgment to MRN on Sheely's claim under Florida law.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

legal ground regardless of the grounds addressed, adopted or rejected by the district court." Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir. 1992).

COX, Circuit Judge, concurring in part and dissenting in part:

I join Part III of Judge Marcus's opinion for the court dealing with non-economic damages under the Rehabilitation Act (RA), and I join Part IV of Judge Marcus's opinion holding that Sheely failed to state a claim under Florida law. I dissent from the mootness discussion in Part II of his opinion in light of the court's fact-finding. Fact-finding is the business of the district court–not the court of appeals.

The issue before this court is whether the district court properly granted summary judgment on the mootness issue. The majority decides that summary judgment was improper. I concur in that determination. The problem is that the majority engages in fact-finding on the mootness issue and effectively grants summary judgment to Sheely on the issue of mootness by denying MRN the opportunity to resolve in its favor disputed issues of fact regarding the new policy.

The district court's summary judgment order found that the "policy modification is exactly the relief this Court could have granted to Plaintiff [and] [t]he record is undisputed that Defendant consulted an ADA expert, established a formal written policy, and transmitted this written policy to all employees." (R.1-47 at 8) (internal punctuation omitted). The court concluded that there was no real threat of a recurrent violation, stating that "the record is clear that the written

62

access policy is now in force, thus solving any problem that existed."[1] (R.1-47 at 15-16.) Consequently, the district court granted summary judgment to MRN only because Sheely failed to show that MRN would likely commit future violations.

I disagree with the majority's fact-finding on the issue of whether MRN is likely to continue its allegedly discriminatory practices. Whether MRN is likely to renew its challenged conduct in the future is a factual finding within the sole province of the trial court. For example, in Troiano v. Supervisor of Elections, 382 F.3d 1276 (11th Cir. 2004) , we characterized the district court's determination of whether the defendant would renew its challenged conduct as a factual finding and reviewed it for clear error. Id. at 1285. Similarly, in United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 89 S. Ct. 361 (1968), the Supreme Court stated that the determination of future violations was a "matter for the trial judge." 393 U.S. at 203-04, 89 S. Ct. at 364. It is the district court's responsibility to make factual findings, not ours. S.S. Silberblatt, Inc. v. U.S. ex rel. Lambert Corp., 353 F.2d 545, 550 (5th Cir. 1965) ("It is not the province of this court to determine the essential facts on which the judgment is based; that is the proper function of the trial court.").

---

[1] The majority ignores this critical fact, which the district court characterized as undisputed, when it states that the court only referenced three undisputed facts in its mootness discussion. See Maj. Op. at __ n.15.

The majority correctly notes that the district court did not consider the three voluntary cessation factors[2] nor make factual findings on the issue of continued harm, and therefore, we have no factual findings to review on appeal. See Maj. Op. at __ n.15. The district court did not make factual findings, however, because it believed MRN was due summary judgment on the mootness issue because the record was undisputed that MRN would not renew its challenged practices. If summary judgment was improper, the court should reverse the grant of summary judgment and remand the case to the district court with instructions to either try the case or, at a minimum, conduct an evidentiary hearing to make findings of fact on the issue of future harm.

Instead, the majority applies the three factors for the first time on appeal and makes factual findings in the process, despite saying that the record is "undisputed."[3] For example, regarding the first voluntary cessation factor–whether

---

[2] The three factors are: (1) whether the challenged conduct was isolated or unintentional, as opposed to continuing and deliberate; (2) whether the defendant's voluntary cessation was timed so as to avoid litigation; and (3) whether the defendant admitted liability. Maj. Op. at __.

[3] The majority quotes as its justification for fact-finding the district court's statement that the record is "undisputed." While it is true that the district court said the record is undisputed, it believed the record showed, without dispute, that MRN would not renew its challenged practices in the future. Interestingly, however, the majority reaches the opposite conclusion on this "undisputed" record.

Further, as support for its fact-finding without remand to the trial court, the majority cites another case where the record on appeal was said to be undisputed. Maj. Op. at __ n.15 (citing Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1324 (11th Cir. 2004) ("The facts of this case are not in dispute.")).

the challenged conduct was isolated or part of a pattern–the majority finds that MRN's treatment of Sheely was the result of a "years-long policy," contrary MRN's contention that it was an isolated incident. This is a disputed issue of fact best resolved by the district court. On the second voluntary cessation factor–the reason for ceasing the challenged activity–the majority makes a credibility determination regarding MRN's motivation for implementing a new policy toward service animals. The majority states that "the record does suggest that MRN was motivated by a desire to avoid liability" and that MRN's Vice President of Finance and Business Administration, Rick Steinberg, conceded as much when he said that the purpose of the policy was to "avoid future disputes such as [this one]." Maj. Op. at __.  But, a complete reading of his statement suggests a genuine motivation for enacting the policy. Mr. Steinberg states that

> [t]he purpose of the written policy was to inform employees of [MRN's] commitment to follow the law with respect to service animal access, to help employees identify service animals, to inform employees of [MRN's] rules related to service animal access and to go above and beyond the requirements of the ADA and Florida law so as to avoid future disputes such as the one at issue [in this case].

(R.1-30, Steinberg Aff. ¶ 4.)

Therefore, whether MRN adopted the new policy in an effort to moot the current litigation or simply to come into compliance with the ADA and RA is also a question of fact that should be resolved by the district court.

65

Finally, the majority questions the sincerity of MRN's intentions to adhere to its new policy, saying that MRN "may well calculate that its new policy is no longer the preferable course of action and revert to the old policy it prefers . . . ." Maj. Op. at __. This statement constitutes a credibility finding–one that is within the sole province of the trial court–and is contrary to Mr. Steinberg's statement of intention to comply with the policy. ("All [MRN] employees are required to read, understand and follow the Service Animal Policy and sign an acknowledgment from verifying in writing that they will in fact do so." (R.1-30, Steinberg Aff. ¶ 5.)) The district court thought that MRN's intentions to follow the policy were sincere. ("The record is undisputed that [MRN] consulted an ADA expert, established a formal written policy, and transmitted this written policy to all employees. . . . The relief that the Court would have granted . . . has already been accomplished by [MRN's] adoption of [the policy]." (R.1-47 at 8.))

This is not the first time an appellate court has engaged in fact-finding on appeal. But, that does not make it right. I respectfully dissent.